In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1686

PIRELLI ARMSTRONG TIRE CORPORATION
RETIREE MEDICAL BENEFITS TRUST,

*Plaintiff-Appellant,*

*v.*

WALGREEN COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 cv 2046—**Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 30, 2010—DECIDED JANUARY 21, 2011

Before FLAUM, MANION, and TINDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. The plaintiff in this case, Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("Pirelli"), initiated a putative class action under the Illinois Consumer Fraud and Deceptive Business Practices Act. For tax law purposes, Pirelli is a voluntary employees' beneficiary association, a tax exempt trust that exists to provide specified benefits to members

of its related association. For our purposes, however, Pirelli is a third-party payor (typically one's insurance company) that pays pharmacies for the portion of a drug price that exceeds its members' co-payments. Pirelli's lawsuit maintains that the defendant, Walgreen Company ("Walgreens"), systematically took prescriptions that were written for cheap forms of two popular drugs and illegally filled the prescriptions with expensive forms. The district court granted Walgreens' motion to dismiss, ruling that Pirelli failed to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). We affirm the judgment of the district court.

## I.  Background

When a patient takes a prescription to a pharmacy, the pharmacy has some maneuvering room: it generally can fill the prescription with either the specified drug or a generic, "bioequivalent" version of the drug. Under Illinois law, however, a pharmacy cannot take a prescription for the tablet form of a drug and fill it with the capsule form of the drug, or vice-versa—the practice is forbidden by statute and the differences in form might affect how a person absorbs the active ingredients. *Warner-Lambert Co. v. Shalala*, 202 F.3d 326, 327-28 & n.2 (D.C. Cir. 2000) (providing an overview of the regulatory regime and its implications); 225 ILCS 85/25 (a pharmacist may substitute only drugs that the Food and Drug Administration ("FDA") has determined to be therapeutically equivalent); *cf. also* B.G. Charles & G.A.G.

Mogg, *Comparative* in Vitro *and* in Vivo *Bioavailability of Naproxen from Tablet and Caplet Formulations*, 15 BIOPHARM. & DRUG DISPOSITION 121, 125 & Figure 1 (1994).

Pirelli alleges that Walgreens, a company that operates roughly 7,000 pharmacies nationwide, violated the regulatory regime in Illinois with respect to two different drugs. One drug was generic Zantac ("Ranitidine"). The other was generic Prozac ("Fluoxetine"). Walgreens allegedly took prescriptions that called for the less costly form of each drug and filled them with the more costly form. Consumers, responsible for only the co-pay, were none the wiser. But Pirelli unwittingly reimbursed Walgreens for costly forms of drugs that were never prescribed.

That is the shorthand version; to explain how the alleged scheme worked, Pirelli's complaint provides considerable detail about the drug approval process before the FDA, the drug reimbursement process, and the industry actors involved. We can summarize. Pirelli, as a third-party payor, used a Pharmacy Benefit Manager ("PBM") to process, settle disputes over, and pay pharmacies for prescriptions. Essentially, the PBM is a go-between that processes and smoothes over transactions between the third-party payor (Pirelli) and the pharmacy (Walgreens). The PBM is not only a middleman, however; it establishes a list of Maximum Allowable Costs ("MAC") for various drugs. The MAC list gets turned over to pharmacies like Walgreens. The list sets a reimbursement price—effectively placing a ceiling on the price of specified drugs. For drugs, or dosage forms of drugs, that are not on the MAC list, the reimbursement price is based

on a benchmark, called the Average Wholesale Price ("AWP"), which comes directly from a drug's manufacturer. Predictably, when a drug is priced based on the AWP, the reimbursement is higher than when reimbursement is based on the MAC price. Put another way, a pharmacy makes more money when it sells a drug whose reimbursement is governed by the AWP rather than by the MAC list.

According to Pirelli, Walgreens took advantage of the pricing scheme to commit fraud. Both Ranitidine tablets and Fluoxetine capsules were the most popularly prescribed forms of their respective drugs and were subject to reimbursement based on the cheaper MAC list. But, because the more expensive forms of the drugs were rarely prescribed, there were no MAC-list prices for Ranitidine capsules and Fluoxetine tablets. Since mid-2001, Walgreens adopted a policy of filling prescriptions for Ranitidine tablets with the more costly capsule form. Likewise, Walgreens filled prescriptions for Fluoxetine capsules with the more costly tablet form. Each time it filled a prescription, the theory goes, Walgreens represented to the PBM that it had received a prescription for the costly form of the drug; the PBM passed on the misrepresentation to Pirelli, who then reimbursed Walgreens at the more expensive AWP price—two to four times higher than the MAC price.

That is a lot of detail[1], although detail ("particularity") is what a plaintiff needs in alleging fraud to satisfy the requirements of the Federal Rules of Civil Procedure. The particularity requirement ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations. And the requirement dovetails with lawyers' ethical obligations to ensure they conduct a pre-complaint inquiry before signing off on their clients' contentions. What sort of pre-complaint inquiry is evidenced by Pirelli's complaint? The complaint points to three grounds for its suspicion that Walgreens defrauded it. The first ground is a "preliminary review" of Pirelli's reimbursement data: during the course of the (apparently nationwide) review, Pirelli discovered "several instances in which [Pirelli] paid Walgreens for the more expensive dosage forms, when lesser [sic] expensive dosage form [sic] were available." That allegation, at least in a vacuum, is not impressive. The data include a five-year

---

[1] Perhaps more than we needed in some respects, particularly in terms of minutiae about the drug industry and its regulatory workings and commercial contours. *See, e.g., Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (providing a simple formulation of how fraud might have been alleged in the case, which in turn shows that the requirement in the rules for fraud averments are not at war with the rule that complaints be succinct). In this case, however, the allegations were hefty but not confusing, so we note only that Pirelli might have saved some paper, or used it to address the deficiencies we identify below.

window, and one would expect some number of instances when the more expensive forms of the drugs were prescribed: Pirelli found 11 members on whose behalf it reimbursed Walgreens for the more expensive form of Ranitidine and just a single member on whose behalf it reimbursed Walgreens for the more expensive form of Fluoxetine. Only one member's reimbursements occurred in Illinois. Moreover, the fact that the drug companies make multiple forms suggests that there are markets for them. And since the body may absorb capsules and tablets differently, there could be medical reasons for preferring one form of the drug over another in specific cases.

The more interesting aspect of Pirelli's preliminary look comes from a subset of its data. Pirelli found three members—one in Illinois, one in Louisiana, and one in Iowa—who filled some prescriptions at Walgreens and others at different pharmacies. The data are presented in tables for each of the three members; the tables list the date of each transaction, the pharmacy involved in the transaction, and the dosage form for which Pirelli reimbursed the pharmacy. The three histories show that non-Walgreens pharmacies filled each member's Ranitidine prescription with tablets, while Walgreens filled the same member's prescription with more costly capsules. For example, Pirelli's exhibit shows that its single Illinois patient had 16 prescriptions for Ranitidine filled at 3 different pharmacies. Only Walgreens filled prescriptions with the more costly form of the drug. In each case, one cannot see if the reimbursements were made under the same prescription, although it does

appear that something suspicious was happening: the transactions involving Walgreens are sandwiched between transactions from other pharmacies, and no one has suggested that a person might receive prescriptions for both the tablet form of a drug and the capsule form.[2] The pattern of reimbursements suggests that the three members were supposed to get the cheaper form of Ranitidine and they did not, either the result of a prescription-filling error or fraud.

The second ground for Pirelli's suspicion, and where Pirelli gets most of its information about how the alleged fraud worked, is a complaint filed in a 2003 *qui tam* action in the Northern District of Illinois (the "*qui tam* case"). The allegations in that whistleblower suit, based on accusations made by a pharmacist, indicate that "[u]pon receiving a [Ranitidine] tablet prescription, Walgreens' pharmacy personnel could not process the orders as written, but instead filled the prescriptions with capsules." The pharmacist in question did not actually work for Walgreens. Rather, the pharmacist worked for other pharmacies; when he would receive prescriptions that were being transferred from Walgreens to one of the pharmacies where he worked, the Walgreens pharmacists "regularly indicated" how their prescription-filling system functioned. *See* Compl. ¶¶ 16-17, *United States ex rel. Lisitza v. Walgreens Co.*, No. 03-cv-744 (N.D. Ill. Jan. 31, 2003).

---

[2] Pirelli does not know what form the doctors actually prescribed for these members; it says that it lacks access to the prescriptions, and Walgreens does not say otherwise.

The third ground for Pirelli's suspicion comes from an investigation that was conducted by another PBM, not the one that Pirelli used. The PBM looked at transactions that it had facilitated with Walgreens, drawing most of its data from St. Louis, Boston, and Phoenix. The investigation indicated that, for the transactions that the PBM facilitated, Walgreens filled an overwhelmingly large percentage (97 percent) of Ranitidine prescriptions with capsules, while every other pharmacy filled prescriptions for Ranitidine with capsules at a meager rate (3 percent). Given the relative popularities of the two dosage forms, the data indicate that something suspicious was happening and that clerical errors do not dispel the suspicion. The PBM's investigation was the basis of a lawsuit (the "ESI suit").

In 2009, Pirelli filed a suit of its own. Pirelli initiated a putative class action on behalf of all third-party payors who reimbursed Walgreens for Ranitidine capsules, Fluoxetine tablets, or both, between 2001 and 2005. Pirelli initially contended that Walgreens' actions violated 35 different states' unfair or deceptive acts laws, including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. In addition to the fraud claims, Pirelli brought an unjust enrichment claim under Illinois law. However, the laws of all of the states besides Illinois have been pruned from the litigation: the parties litigated the case as if Illinois law applied to Pirelli's claims, the district court indicated that it was considering this only as an Illinois case, and Pirelli has not attempted to expand the scope of the litigation.

Walgreens moved to dismiss the complaint, and the district court granted the motion, first without prejudice and then with prejudice. The district court reasoned that Pirelli did not adequately meet the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) because Pirelli did not "provide facts showing that any individual at a Walgreens store made a misrepresentation or concealed a material fact." Moreover, relying on case law from this circuit, the district court observed that Pirelli had failed sufficiently to allege that *it* had been injured by Walgreens' fraudulent scheme, a prerequisite to recovery under Illinois law. Finally, the district court concluded that the complaint in the *qui tam* case "help[ed] lay the foundation for Pirelli's argument about Walgreens' corporate policy, [but did] not substantiate Pirelli's claim that it was itself defrauded by Walgreens." Thus, the court ruled that the complaint failed to plead fraud with sufficient particularity as the federal rules require.

## II. Discussion

The sufficiency of a complaint is a question of law that we decide without deference to the district court's ruling. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 395 (7th Cir. 2009). Although we do not adopt all of the district court's reasoning, the complaint was appropriately dismissed. Pirelli failed to plead adequate grounds for its suspicions of fraud, and its unjust enrichment claim was hitched to its fraud claim. The shortcomings of the fraud claim doomed the unjust enrichment claim.

## A. Pirelli's Fraud Claim

Pirelli maintains that Walgreens' alleged scheme violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). The ICFA makes it unlawful to use deception or fraud in the conduct of trade or commerce.[3] In addition to its general proscriptions, the act provides a right of action for a person who suffers "actual damage" as a result of a violation. 815 ILCS 505/10a(a). When a plaintiff in federal court alleges fraud under the ICFA, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005).

The concepts involved are relatively straightforward, but this appeal implicates important wrinkles that merit discussion. Under Rule 9(b) of the Federal Rules of Civil Procedure, a party who alleges fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." As one district court has noted, the particularity requirement of Rule 9(b) is de-

---

[3] The provision provides: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of [specified practices] in the conduct of any trade or commerce are hereby declared unlawful . . . ." 815 ILCS 505/2 (footnotes omitted).

signed to discourage a "sue first, ask questions later" philosophy. *Berman v. Richford Indus., Inc.*, 1978 WL 1104, at *5 (S.D.N.Y July 28, 1978); *see also Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748-49 (7th Cir. 2005) (the particularity require-ment "forces the plaintiff to conduct a careful pretrial investigation" and minimizes the risk of extortion that may come from a baseless fraud claim); *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003) (the particularity requirement protects defendants from "privileged libel").

In adding flesh to the bones of the word particularity, we have often incanted that a plaintiff ordinarily must describe the "who, what, when, where, and how" of the fraud—"the first paragraph of any newspaper story." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). Yet, because courts and litigants often erroneously take an overly rigid view of the formulation, we have also observed that the requisite information—what gets included in that first paragraph—may vary on the facts of a given case. *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (flexibility when information lies outside of plaintiff's control); *In re HealthCare Compare Corp. Secs. Litig.*, 75 F.3d 276, 285 (7th Cir. 1996) (Ripple, J., dissenting) (noting that reasonable minds can and will differ on the adequacy of a given fraud averment); *see also Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) ("What constitutes 'particularity' will necessarily differ with the facts of each case . . . ."). The twin demands of detail and flexibility, though in tension with one another, make

sense in light of the competing purposes of the federal rules. Heightened pleading in the fraud context is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled. At the same time, the adoption of the Federal Rules of Civil Procedure constituted a self-conscious departure from prior pleading regimes that emphasized form for form's sake. *See also* 2 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 9.03[1][b], at 9-18 (3d ed. 2010) (although "plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts," they still must "use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud"); David Marcus, *The Federal Rules of Civil Procedure and Legal Realism as a Jurisprudence of Law Reform*, 44 GA. L. REV. 433, 471 (2010) (contending that Charles Clark, one of the primary drafters and exponents of the federal rules, used code- and common-law pleading instrumentally as the "foil[s] for his procedural jurisprudence").

Here is the wrinkle and the rub. A plaintiff who alleges fraud can provide all the detail in the world, but does not have unlimited leeway to do so on "information and belief." When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are "based on second-hand information that [he] believes to be true." BLACK'S LAW DICTIONARY 783 (7th ed. 1999); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) (quoting

BLACK'S LAW DICTIONARY 779 (6th ed. 1990)). Although Pirelli did not use the phrase "information and belief" in its complaint, its allegations fall squarely within the definition of the term. *See also Dey v. Cont'l Cent. Credit*, 88 Cal. Rptr. 3d 241, 244 n.1 (Cal. Ct. App. 2008) (allegations based on hearsay constitute information and belief). As counsel for Pirelli stated at oral argument, "We're secondhand on a lot of this information . . . we're picking up from the *qui tam* complaint . . . adopting these allegations."

That insight about Pirelli's allegations has consequences. Even though it sounds more like an ethical issue than an evaluation of the amount of detail in a complaint, we have ruled that a plaintiff generally cannot satisfy the particularity requirement of Rule 9(b) with a complaint that is filed on information and belief. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) ("Even before Rule 11 was amended to require [reasonable pre-complaint inquiry], and *a fortiori* since, it was understood that the duty to plead the circumstances constituting fraud with particularity could not be fulfilled by pleading those circumstances on 'information and belief[.]'"). The general rule that fraud cannot be pled based on information and belief is not ironclad, however: the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides "the grounds for his suspicions." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); *Bankers Trust*, 959 F.2d at 684.

Here, Pirelli's complaint skips the phrase "information and belief" and just provides the grounds for its suspicions: besides its preliminary look at its own reimbursement data, the complaint relies on the ground that other people have sued Walgreens and detailed their allegations. But when someone alleges fraud based on information and belief, not just any grounds will do. The grounds for the plaintiff's suspicions must make the allegations *plausible*, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail. *See In re Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also Lusby*, 570 F.3d at 854 (concluding that the knowledge evinced in a *qui tam* relator's fraud complaint supported a plausible inference of fraud in that case). Although the federal rules are flexible in this realm, allegations based on the mere filing of other lawsuits generally will not provide much in the way of plausible corroboration of a plaintiff's fraud. *But cf. Thornton v. Evans*, 692 F.2d 1064, 1081 (7th Cir. 1982) (holding, in a context different than Rule 9(b) but animated by similar concerns, that "where the acts constituting fraud and conspiracy [were] peculiarly within the defendants' knowledge," it was permissible to base a verification statement on information from public filings in other lawsuits, published government reports, and information in the media).

It is appropriate to accord limited corroborative weigh to allegations in another's lawsuit. To appreciate why, consider the 2003 *qui tam* case. We take judicial notice of the complaint in the *qui tam* case, even though only

portions were cited in Pirelli's complaint. *See 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008). Notably, the complaint of massive fraud in the *qui tam* case itself is based largely on information and belief. *See, e.g.,* Compl. ¶¶ 20, 23, 36, *United States ex rel. Lisitza v. Walgreens Co.*, No. 03-cv-744 (N.D. Ill. Jan. 31, 2003) (detailing particulars of how the fraudulent scheme worked). The whistleblower ("relator" in the statutory argot) who made the allegations did not actually observe the prescription-filling practices. Rather, he alleged that he was a temporary pharmacist who was placed by an employment agency at pharmacies other than Walgreens. He typically was placed at pharmacies "somewhere" in Illinois. When he would receive prescriptions that were transferred from Walgreens to one of the pharmacies to which he was temporarily assigned, the relator observed that Ranitidine prescriptions were filled by Walgreens with the more expensive capsules. According to the complaint, the relator asked about this and "Walgreens pharmacists regularly indicated that Walgreens had set up its system so that [R]anitidine tablets were impossible to provide, and that all [R]anitidine prescriptions were filled as capsules despite what a physician had specifically prescribed." *Id.* ¶¶ 16-18. Details of what the relator learned, such as the timeframe during which Walgreens pharmacists would make the alleged confessions, whether the relator's observations were universal, or the geographic scope of the fraud, are not fleshed out.

That is not to say that the complaint in that case would have been inadequate *as to that plaintiff*. The al-

legations in the *qui tam* case were made by a whistle-blower. The *qui tam* relator surely lacked access to reimbursement data from third-party payors that would have allowed him to provide additional circumstances corroborating the existence of fraud. But the same conclusion obviously would not apply to a third-party payor itself. It would be odd if a complaint like this, itself based on information and belief, could constitute plausible corroboration for a fraud claim brought by a third-party payor, without pointing to any meaningful indication that the plaintiff had been injured. Imagine the possibilities under a contrary approach: Case Number 1 in one jurisdiction could be filed on information and belief, which would prove insufficient. Yet, a second litigant could bring Case Number 2, alleging a fraud based on the complaint in Case Number 1 and survive a motion to dismiss, having done sufficient pre-complaint inquiry by doing little more than reading a daily law bulletin. The outcome would be odd indeed.

The allegations in the ESI suit, too, are problematic, though for a slightly different reason. The matter pled in the ESI suit not only speaks to the existence of a fraud but attempts to address whether Pirelli was injured by a fraudulent scheme. ESI learned that an overwhelmingly large percentage of prescriptions for Ranitidine in primarily three geographic areas (none in Illinois) was filled with the more expensive, less prescribed dosage form of the drug. Those allegations tend to show that ESI was injured by a fraudulent scheme.

The district court was correct not to place weight on the allegations in the ESI suit. Again, Pirelli is relying on

the mere fact of someone else's allegations, which evince little pre-complaint inquiry on Pirelli's part and which speak to potential fraud in three other jurisdictions outside of Illinois in any event. A plaintiff pleading fraud on information and belief has to show that the missing pieces are outside of its control. *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 471 (7th Cir. 1999). But Pirelli has not suggested (much less explained why) it does not have the requisite knowledge about its reimbursement data to bolster its complaint with information like that which apparently undergirds the ESI suit. Although "Rule 9(b) is satisfied by a showing that further particulars of the alleged fraud could have been obtained without discovery," *Emery,* 134 F.3d at 1323, it strikes us that information like that pled in the ESI Suit would not be the product of discovery but of a more fulsome look at its own data.

Because it is appropriate to give limited if any weight to the ESI suit, we turn to Pirelli's preliminary reimbursement data. Those data comprise an exhibit to Pirelli's complaint showing only that it reimbursed Walgreens for the more expensive form of Ranitidine for eleven of its members since 2001. (Only one of the members was in Illinois.) In addition, it reimbursed Walgreens for the more expensive form of Fluoxetine for two members since 2001. (Neither member was in Illinois.) Pirelli has not placed the data in context, however, and there is no reason to think that reimbursements for a total of eleven members nationwide is suspicious—among all of the pharmacies with which Pirelli had dealings, did only Walgreens seek reimbursement for the more expensive

form of Ranitidine over this period? Are prescriptions for that form so exceedingly rare that the mere fact of reimbursement should raise eyebrows? Pirelli has not pled or argued that the answer to these questions is yes, and common sense, *cf. Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (courts should draw on "judicial experience and common sense" in determining whether a given claim is plausible), says that the answer to each is likely to be no. Nor has Pirelli provided overall reimbursement figures for these drugs. The fact that drug companies make multiple forms of drugs and that there may be therapeutic reasons for preferring one over another suggest that there are markets for different forms of the drugs. In short, the data, untethered as they are, cannot corroborate a fraud because their free-floating nature stymies any meaningful understanding of what the numbers mean. Absent a reason to think otherwise, the most plausible explanation for dispensing a well known, popular drug in any form is that it was prescribed.

We see no reason why Pirelli, which apparently has mined its national data in search of these transactions, could not easily have done more. Something along the lines of the allegations underpinning the ESI suit would have improved Pirelli's pleading fortunes. But a better presentation of its data might have done the trick, too. Putting the numbers in context could tell us whether Pirelli also reimbursed Walgreens for the *cheaper* form of the drugs in the five-year period that Pirelli examined. To the extent it did not, the fraud claim would be supported; to the extent it did, it would be undermined.

Or we could see if reimbursements for the more expensive forms of the drugs outstripped reimbursements for the cheaper versions in an unlikely way. Pirelli did not have to dance to ESI's comprehensive statistical tune, but did need to provide firsthand facts or data to make its suspicions plausible. Pirelli's *de minimis* showing tells us little and does not fulfill Rule 9(b)'s purpose of "forc[ing] the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman*, 172 F.3d at 469.

In an effort to stave off dismissal, Pirelli does point to the subset of three members from its preliminary data, but those data, too, suffer from fatal shortcomings. Recall that Pirelli examined a subset of the twelve members on whose behalf it reimbursed Walgreens. Pirelli broke out the reimbursement patterns for three of its members who had Ranitidine prescriptions filled by both Walgreens and other pharmacies. The records show that Walgreens reimbursed Pirelli for the more expensive form of Ranitidine while other pharmacies were reimbursing Pirelli for the cheaper form. The reimbursements came during overlapping time periods, so it looks as if Walgreens was either intentionally switching prescriptions or as if there were clerical errors at work.

The small-*n* analysis, however, is problematic, particularly given that we still lack any context for the data. The bare fact of inconsistent reimbursements for three patients in a five-year time period is not sufficient to raise allegations of fraud above the speculative level. Without knowing anything else about the overall numbers involved, the dearth of transactions does not tend

to corroborate the existence of a fraud. Indeed, according to its complaint, Pirelli does business in at least California, Connecticut, Florida, Illinois, Louisiana, and Tennessee. For an entity with national reach, laboring under a system in which prescriptions are transferred from one pharmacy to another, *see* Compl. ¶ 16, *United States ex rel. Lisitza v. Walgreens*, No. 03-cv-744 (N.D. Ill. Jan. 31, 2003), one would expect some number of prescription-filling errors. *See also* TO ERR IS HUMAN: BUILDING A SAFER HEALTH SYSTEM 28-31 (Linda T. Kohn, Janet M. Corrigan, & Molla S. Donaldson, eds., 2000) (stating that medication related errors are among the most common types of errors and suggesting that their frequency may be higher than it appears because studies focus on adverse effects from medication errors rather than errors that cause no harm). Pirelli has offered us no reason to think that these three instances are representative of something broader, and its pleading betrays its own timidity on that score. The complaint characterizes the handful of transactions it identifies as "suspiciously consistent" with the unlawful scheme alleged in the *qui tam* case and the ESI suit. To satisfy the particularity requirement of Rule 9(b) when it made allegations based on information and belief, however, Pirelli needed corroboration, not just consistency.

We do note, however, that both the district court and Walgreens overstated the extent of Pirelli's burden. In order to survive the motion to dismiss phase, Pirelli needed some firsthand information to provide grounds to corroborate its suspicions. A preliminary look at data, in theory, would have been an appropriate means of

accomplishing that task. Had the data showed an unlikely pattern of reimbursements, it would have helped make Pirelli's claim plausible. Moreover, Walgreens is incorrect inasmuch as it suggests that Pirelli necessarily needed Illinois data to establish the existence of a fraudulent scheme. *See Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1051 (7th Cir. 1998) (relaxed standard applies when the information constituting the fraud is in the hands of the defendant). Similarly, the district court was incorrect when it suggested that Pirelli needs to point to specific misrepresentations made by particular Walgreens staffers. Suppose Pirelli had enough reimbursements nationwide to indicate that something was awry but only limited reimbursements in any given jurisdiction. If Pirelli knew that reimbursements of the drugs skewed 75/25 in favor of the cheaper forms with non-Walgreens pharmacies, but the proportions were flipped with respect to Walgreens, it might have provided sufficient grounds to corroborate Pirelli's suspicion that Walgreens was engaged in fraud and that Pirelli was injured by the scheme. *See Corley*, 142 F.3d at 1050 ("the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim"). But those are not the allegations here—and flexibility in the face of information asymmetries should not be conflated with whistling past the rules of civil procedure.

As a proposed end run around the complaint's particularity problems, Pirelli argues that Rule 9(b) does not apply and that it should get the benefit of Rule 8 of the Federal Rules of Civil Procedure. Rule 8, which governs

the allegations in most suits, substitutes particularity for the lesser showing of "fair notice" of the nature of the claim. Fed. R. Civ. P. 8(a)(2); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). The argument is that the more forgiving pleading standards should apply because Pirelli is entitled to recover under the ICFA's bar on unfair practices that fall short of deception. 815 ILCS 505/2 (banning unfair *or* deceptive acts); *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960-61 (Ill. 2002) (discussing factors that make a practice unfair under the ICFA). When a claim alleges an unfair practice, the relaxed pleading standards of Rule 8 do indeed govern. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008).

However, the practices alleged in Pirelli's complaint constitute fraudulent activity, and the dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements."). Here, the complaint alleges that Walgreens unlawfully and intentionally concealed from Pirelli's PBM, or misrepresented to it, the form of the drug that was prescribed and that Pirelli suffered damages as a result. That is fraud predicated on either a misrepresentation or an omission. *See, e.g.*, *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005) (fraud embraces half-truths "that the defendant knows to be misleading and which the defendant expects another to act upon to his detriment and the defendant's benefit");

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (fraud includes misrepresentations, misleading omissions and "embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain advantage over another by false suggestions or by the suppression of truth"). The district court correctly concluded both that Rule 9(b) applied and that its dictates were not satisfied.

In sum, Pirelli's allegations were insufficient. Although a plaintiff generally receives the benefit of reasonable inferences at the motion to dismiss phase, *e.g., Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010), a plaintiff who bases allegations of fraud on information and belief bears the burden of pleading plausible grounds for suspecting that the defendant was engaged in a fraudulent scheme. Pirelli did not shoulder that burden, and its complaint was appropriately dismissed as a result.

## B.  Pirelli's Unjust Enrichment Claim

One loose end remains. Pirelli argues that it has a claim for unjust enrichment even if its fraud claim is not viable. The district court dismissed the claim under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, concluding that the dismissal of the fraud claim took the unjust enrichment claim with it. We agree.

Under Illinois law, unjust enrichment is not a separate cause of action. "Rather, it is a condition that may be brought about by unlawful or improper conduct as

defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct." *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995) (quoting *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 484 N.E.2d 349, 354 (Ill. App. Ct. 1985)). For example, a breach of a contract, or of a fiduciary duty, might create a situation in which someone has retained a benefit that ought to be disgorged based on principles of equity. *See also, e.g.*, *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (citing 1 G. Palmer, THE LAW OF RESTITUTION § 1.1, at 2-4 (1978), and discussing one set of circumstances in which retaining a benefit has been deemed unjust). Pirelli argues that the conduct of which it has accused Walgreens violates state law and therefore it should be able to maintain its unjust enrichment claim. *See Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("Illinois courts have held that conduct rises to the level of *wrongful*, in the context of an unjust enrichment claim, when it violates the law.").

But again, it is allegations of fraud, not claims of fraud, to which Rule 9(b) applies. Pirelli's complaint does not contend merely that Walgreens erred in filling prescriptions, violated the Illinois Pharmacy Act by doing so, and should therefore be disgorged of erroneously obtained benefits. Nor did Pirelli set out its unjust enrichment claim in the alternative, pursuant to Federal Rule of Civil Procedure 8(d)(2). *See Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) ("While [plaintiffs] need not use particular words to plead in the alternative,

they must use a formulation from which it can be reasonably inferred that this is what they were doing."). Rather, the complaint maintains that Walgreens was engaged in a massive, perhaps fully-automated, system of filling prescriptions for the more expensive forms of Ranitidine and Fluoxetine. A system in which other industry actors were deceived. We have found those averments, bolstered by reimbursements to a single member in Illinois for just one of the drugs at issue and by a smattering of untethered nationwide data, insufficient to satisfy Pirelli's information-and-belief plausibility-burden.

In *Caremark RX*, we reaffirmed that "when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable." 493 F.3d at 855. Pirelli's response brief elides the complaint's omission of alternative pleading, subtly reorienting its response brief toward a more straightforward unjust enrichment claim of a type that it might have pled in the alternative. The effort founders, however, because of the axiomatic rule that a plaintiff may not amend his complaint in his response brief. *Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). Therefore, the district court did not err by dismissing Pirelli's unjust enrichment claim.

### III.  Conclusion

For the reasons set forth above, the judgment of the district court is AFFIRMED.