24-In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2001

JOHN WERTYMER,

*Plaintiff-Appellant,*

*v.*

WALMART, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:23-cv-14700 — **Lindsay C. Jenkins**, *Judge.*

ARGUED NOVEMBER 15, 2024 — DECIDED JULY 1, 2025

Before EASTERBROOK, ROVNER, and KIRSCH, *Circuit Judges.*

ROVNER, *Circuit Judge.* John Wertymer alleges that
Walmart defrauded him by selling raw honey, which was not,
in fact, raw. After sending the honey to a laboratory for test-
ing, Wertymer filed this diversity suit for various claims un-
der the state consumer fraud law and for fraudulent misrep-
resentation. The district court found that the complaint failed
to support any of its claims of fraud, misrepresentation, or de-
ceptive practices, and dismissed the complaint. We affirm.

**I.**

Wertymer alleges that he bought two bottles of Walmart's Great Value brand honey in June 2022—one labeled "Raw Honey," and one labeled "Organic Raw Honey." There are no receipts in the record, and he does not report how much he paid for each, but he claims he paid a premium for raw honey because it contains various "sugars, minerals, proteins, enzymes, amino acids, and organic acids" that make it valuable to certain consumers who perceive it to have nutritional and medicinal benefits." R. 26 at 2–3, ¶7-8. About ten months after this purchase, in April 2023, Wertymer's counsel sent it to be tested at a laboratory called "True Honey Buzz, A Division of Authentic Food Solution Limited." Wertymer alleges that the results of those tests support his claim that the honey Walmart sold as "raw honey" was not raw, and thus he paid money for a product that he did not receive.

Through this diversity suit—Wertymer is a citizen of Illinois and Walmart is incorporated in Delaware, with principal offices in Arkansas—Wertymer seeks to represent a nationwide class of people and entities who purchased Walmart's raw honey, or, alternatively, an Illinois class of purchasers. He asserts that Walmart's "Raw Honey" was not raw, as it has been heated, and that the "Organic Raw Honey" was not raw because it had been subjected to industrial processing. According to Wertymer, these processes break down the beneficial nutrients for which consumers pay a premium. His complaint brings causes of action under the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, et seq. (Consumer Fraud Act) (for both deception and unfairness), and for common law fraudulent representation. The district court dismissed Wertymer's claims for declaratory and

injunctive relief for lack of standing, and Wertymer does not challenge that dismissal through this appeal. We review the district court's grant of the motion to dismiss the remainder of the claims *de novo*. *Brockett v. Effingham Cnty., Ill.*, 116 F.4th 680, 685 (7th Cir. 2024).

## II.

Because this case comes to us on appeal from a motion to dismiss, Wertymer need not set forth the amount and kind of factual matter that he might develop during discovery and present at trial. Federal Rule of Civil Procedure 8 requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2). This rule does not demand detailed factual allegations, but it does require more than mere "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Most importantly for our purposes, the complaint must go beyond mere speculation or conjecture and provide factual allegations that allow the court to draw a reasonable inference that Walmart is liable. *Id.* at 678–79. The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The Consumer Fraud Act requires that a plaintiff plead and prove that (1) the defendant committed a deceptive or

unfair act, (2) with the intent that others rely on the deception, (3) that the act occurred in the course of trade or commerce, and (4) it caused actual damages. *Horist v. Sudler & Co.*, 941 F.3d 274, 280 (7th Cir. 2019). "This standard 'requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Kahn v. Walmart Inc.*, 107 F.4th 585, 594 (7th Cir. 2024) (quoting *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020)). A court may dismiss the claim if the labeling is not misleading as a matter of law. *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938–40 (7th Cir. 2001).

Similarly, under Illinois common law, a fraudulent misrepresentation claim requires "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452, 546 N.E.2d 580, 591 (1989). The requirements of both claims are similar and overlap. Notably, both require as a first step that the defendant engaged in some act that was false, deceptive, or unfair.

In addition to the requirements under the Consumer Fraud Act, claims of deceptive conduct are subject to the heightened pleading standard in Federal Rule of Civil Procedure 9(b), which requires the complaint to "state with particularity the circumstances constituting fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (quoting

Fed. R. Civ. P. 9(b)).[1] As a practical matter, Wertymer was required to identify "the who, what, when, where, and how" of the alleged fraud. *Id.* Heightened pleading requirements apply to complaints alleging fraud "to discourage a 'sue first, ask questions later' philosophy." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)). Such a philosophy "can do great harm to the reputation of a business," even if the defendant is later exonerated. *Id.*

In granting the motion to dismiss on Wertymer's first amended complaint, the district court focused the parties on "what a reasonable consumer would believe about raw … honey, or about what Wertymer believed when he bought the product at issue here." R. 25 at 4. Thus, in the amended complaint and in the briefs before this court, Wertymer gives considerable attention to the question of what it is that consumers expect of raw honey. We conclude, however, that we need not delve into what customers expect from raw honey and why. Those arguments address what we have labeled as prongs two and four of a cause of action under the Consumer Fraud Act—that is whether Walmart committed the deceptive act (2) with the intent that others rely on the deception, and (4) that it caused actual damages. *Horist*, 941 F.3d at 280. But we need not consider those factors if the complaint fails at prong one—that is, if the complaint does not state a plausible

---

[1] In a diversity case, state law governs substantive issues, but federal laws govern procedural issues. Federal Rule of Civil Procedure 9(b), therefore, governs the pleading standard here. *See, e.g., Camasta*, 761 F.3d at 736–37 (applying F.R.C.P. 9(b) to a claim brought under Illinois Consumer Fraud Act).

claim that Walmart committed a fraudulent or deceptive act by selling honey labeled "raw" that was not raw.

We begin, therefore, by looking at the first requirement for a cause of action under the Consumer Fraud Act—that the defendant committed a deceptive act. In this case, Wertymer alleges that Walmart sold raw honey that was not raw. But what is raw honey? And how do we know that honey Walmart labeled as raw did not meet that definition?

Wertymer references the definition of raw honey from the United States Department of Agriculture, as does Walmart, so we will do the same. According to the that Department, raw honey is defined as "[h]oney as it exists in the beehive or as obtained by extraction, but not filtered. Raw honey may contain fine particles, pollen grains, air bubbles, comb, propolis and other defects normally found in suspension." R.26 at 3, ¶13 & n.3.[2]

Wertymer does not quarrel with this definition, in fact, he cites it in his complaint. Rather, his argument focuses on how one determines that honey *is* raw—that is "as it exists in the hive, but not filtered." *Id.* And by "not filtered," Wertymer means that the honey has not been heated.[3] To make this

---

[2] Citing *USDA Agricultural Marketing Service, Commercial Item Description, Honey* (Oct. 23, 2019), at 5, *available at* https://www.ams.usda.gov/sites/default/files/media/AA20380_Honey.pdf.

[3] Wertymer alleges in the complaint that filtered honey "is not considered raw by consumers, the honey industry, honey producers and purveyors because it is excessively heated during processing (generally to make it flow easier and more quickly, and is less costly to process, thus its retail cost is less); because when raw honey is overheated for an extended period of time, the enzymes in the honey that are prized by consumers

(continued)

determination, he asks the court to connect multiple dots. He alleges that raw honey contains desired enzymes and other attributes but does not tell us precisely what those are. He then alleges that heating honey to certain temperatures decreases or eliminates those enzymes and other unnamed beneficial properties. Then, he informs the court that there is a test—not to detect if those enzymes are missing—but rather to determine if honey is heated. This test measures the level of a chemical named 5-hydroxymethylfurfural (HMF). Wertymer claims that "[r]eal raw honey typically comes out of the beehive with an absence of any HMF, or with an HMF value less than 10 mg/kg." R. 26 at 6, ¶29. The laboratory to which Wertymer sent the Walmart honey samples determined that the honey Walmart labeled as "raw honey" had an HMF level of 22 mg/kg. From this he concludes that Walmart's raw honey was heated and thus was not raw as advertised on the label.

In other words, Wertymer uses HMF as a proxy for heating, and heating as a proxy for "not raw honey," which he alleges lacks the attributes consumers desire. Contrast this with a hypothetical complaint in which Wertymer alleged as follows: "consumers value raw honey because it includes the

---

who purchase raw honey begin to break down and are lost." R. 26 at 3, ¶9. In other words, according to Wertymer, the process that allegedly harms the beneficial properties of honey is the heating of the honey so that it can be filtered, and not necessarily the filtering itself. (We do not know if filtering alone removes some of Wertymer's claimed beneficial properties, but that is not the argument he makes in his complaint). At oral argument, Wertymer's counsel stated that filtering and heating were the same thing. Oral argument at 11:51–11:57. In short, the terms "heated," "filtered," and "not raw" could all be used interchangeably for purposes of Wertymer's claim.

enzyme diastase. We tested this honey for the presence of diastase and found it was lacking." Wertymer was not required to have such a direct "a caused b" claim to survive a motion to dismiss, but if any of the links in his more attenuated chain breaks apart, then the complaint for fraudulent misrepresentation fails as a whole.

Indeed, his claim fails from the start because his own allegations recognize that HMF is a proxy not merely for heating, but also for myriad other factors, most notably, length and conditions of storage. As the complaint states: "[A]lthough HMF occurs at very low concentrations and can even be absent in both *fresh* honey and food products, heat treatment *and/or prolonged storage conditions* can enhance further HMF production.'" R. 26 at 6, ¶28.[4] (emphasis ours). Wertymer would like the court to assume, without offering any reason, that in this case the high HMF values came from heating and not storage, but given the allegations of his own complaint, this is too speculative an inference to survive a motion to dismiss.

A complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint is too speculative where there is an "obvious alternative explanation" for the complaint's factual allegations. *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567 (2007); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019). Here

---

[4] Citing Ummay Mahfuza Shapla et al., "5-Hydroxymethylfurfural (HMF) levels in honey and other food products: effects on bees and humans" Chemistry Central Journal, April 4, 2018, at 1–18, *available at* https://bmcchem.biomedcentral.com/articles/10.1186/s13065-018-0408-3. The article can be downloaded as a PDF. We use the page numbers as they appear in the PDF version of the article.

there is an obvious alternative explanation for the high HMF levels, if, in fact, they are high at all (more on that below). As the complaint itself describes, the tested honey was not freshly extracted from the hive but rather had been stored for at least ten months before testing. *See* R. 26 at 8, ¶49 (noting that the honey was purchased on June 13, 2022); *Id.* at exh. 4, p.1 (indicating that sample was not tested until April 11, 2023). Wertymer has pled himself out of court by indicating directly in his complaint competing theories for the allegedly high HMF values—heat or storage. *See* R. 26 at 6, ¶28. According to Wertymer's complaint, either heat *or* storage caused the high HMF value, and only one states a claim for fraud or deception. Imagine a complaint for a car accident in which the plaintiff claims that either the local milk delivery truck cut her off, causing her to swerve into a tree, or she fell asleep at the wheel. No reasonable judge would allow this plaintiff to subject the milk delivery truck driver to trial for negligence when the complaint itself supplies an alternative explanation for the crash that exculpates the defendant.

Wertymer has further doomed his complaint by referring to and relying upon documents that also belie his claims by offering "obvious alternative explanations" for the complaint's factual allegations. *Twombly*, 550 U.S. at 567. Our liberal federal pleading standards do not require plaintiffs to attach documents to complaints or refer to outside evidentiary matters to state a claim, but where a plaintiff opposing a Rule 12(b)(6) motion refers to materials outside of the pleadings that are critical to the complaint, a court may consider those documents as illustrative of the facts the plaintiff expects to be able to prove at trial. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Williamson v. Curran*, 714 F.3d 432, 443 (7th Cir. 2013). "A motion under Rule 12(b)(6) can be

based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky*, 675 F.3d at 745 n.1. Reference to these materials does not necessarily convert the motion to dismiss into a motion for summary judgment, rather the plaintiff utilizes the outside material to illustrate for the court how it intends to prove its claim. *See Geinosky*, 675 F.3d at 745 n.1; *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009).

The documents upon which Wertymer relies and has made essential to his claim lay bare the speculative nature of the complaint. Those documents indicate that HMF is an indicator of several factors including: (1) heating, (2) geographic location of harvesting, (3) chemical composition of the honey, or (4) degradation that comes from aging while in storage. Wertymer has given the court no reason why his explanation for the allegedly high HMF value—that Walmart's honey was heated—is more likely than the others.

Wertymer's complaint rises or falls on one data point—his claim that raw honey must have an HMF value below 10mg/kg. Walmart's honey had an HMF value of 22mg/kg and therefore, he alleges, was not raw. Wertymer's complaint offers but one source for this 10 mg/kg limit—the commercial website of a raw honey seller in New Zealand, Airborne Honey Limited. According to the complaint, Airborne's website states, "[i]t is usual for HMF to be below 10 mg/kg in *fresh* extracted honey. Levels higher than this *may* indicate excessive heating during the extraction process." R. 26 at 6, ¶30 (emphasis ours).[5] We have also viewed this claim on the

---

[5] Citing,

(continued)

website to which the complaint points us. Because the complaint cites to the webpage on airborne.co.nz as authoritative and one of the key documents to his claim, we may consider the entirety of that page. *See Cmty. Bank*, 887 F.3d at 809 n.2. When the plaintiff, in the complaint, refers to a document that is critical to the claim, and does not deny its accuracy, the assertions contained in that document control over plaintiff's allegations to the contrary. *Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 623 (7th Cir. 2020).

Neither the complaint nor the website offers any source—scientific or otherwise—for the 10mg/kg limit. The full statement suggests that the honey seller, Airborne, is using this number as a marketing tool for sales of its own honey:

> The HMF score. HMF (HydroxyMethyl-Furfuraldehyde) is used as a measure of heat and *storage changes* in honey. It is *usual* for HMF to be below 10 mg/kg in *freshly extracted* honey. Levels higher than this *may* indicate excessive heating during the extraction process. All Airborne honey has an average score of 6mg/kg. We've measured thousands of honey samples in our lab, and consistently,

---

https://www.airorne.co.nz/pages/hmf#:~:text=It%20is%20usual%20 for%20HMF,heating%20during%20the%20extraction%20process.&text= The%20hdroxymethylfurfural%20content%20of%20honey,more%20than %2040%20mg %2Fkg. The information is no longer available on this page, but the same quote can now be found on the website at: https://www.air-borne.co.nz/blogs/blog/raw-unfiltered-why-does-it-matter?_pos=1&_sid= fa56a91e0&_ss=r (emphasis ours). This highlights the necessity for counsel to either give the court "permalinks" or to attach documents to the complaint itself.

> Airborne has the lowest HMF score on the market![6]

Even were we to accept, for purposes of this motion to dismiss, what appears to be a marketing statement as scientific fact, the statement—which Wertymer has made the very cornerstone of his complaint—does not support Wertymer's claim. It states only that HMF levels higher than 10 mg/kg "*may* indicate excessive heating," and only that it is "*usual*"— that is, not universally true—for levels in *fresh* honey to be below 10 mg/kg. *Id.* (emphasis ours). Most importantly, the full paragraph indicates that HMF values can also be an indication of "*storage changes*," and that the 10 mg/kg number is only an indication of heating in "*freshly extracted*" honey. *Id.* (emphasis ours). We know for certain here that the honey in this case was not freshly extracted from the hive. It was not tested until ten months after purchase, and we do not know how much time had passed from extraction from the hive to the date of purchase. Wertymer's reliance on a claim about what *might* be true for a product that he did not have tested (fresh honey) is simply insufficient to state a claim.

Wertymer has told us numerous times that he has multiple sources for the claim that HMF values must be below 10 mg/kg in raw honey. In his opening brief he says that he "cites several sources to support his position that raw honey has certain HMF values." Wertymer Brief at 11 (internal citations omitted). His reply brief states "Plaintiff cites several sources that state (i) raw honey is unheated; (ii) for raw honey, HMF, used to detect heating in all foods, is typically absent or in the

---

[6] https://www.airborne.co.nz/blogs/blog/raw-unfiltered-why-does-it-matter?_pos=1&_sid=fa56a91e0&_ss=r (emphasis ours).

single-digits; and (iii) to be absent or in the single-digits a value must be less than 10." Reply at 8–9 (internal footnote omitted). At oral argument Wertymer's counsel reiterated this "multiple source" claim by saying: "plaintiffs cited three separate sources for th[e] fact" that "raw honey typically has an HMF value that is absent, in the single digits, or less than 10 mg/kg." Oral argument at 4:35–4:49. Later in the oral argument he told the court, "plaintiff cited in paragraphs 27, 28, and 30, a peer-reviewed open-sourced chemistry journal, a self-described leading European food industry laboratory testing facility, as well as a New Zealand honey producer for the prospect that raw honey typically has an HMF value that is absent, in the single digits, or less than 10." Oral argument at 7:32–7:57. But despite this claim of "multiple sources," neither the opening brief nor the reply brief indicate where these three separate sources state that raw honey must have an HMF value less than 10 mg/kg, nor does his briefing point us to any specific page or web page for this numerical limit other than the New Zealand honey producer's commercial website. We have scoured Wertymer's complaint, including by reading every study cited in the footnotes, and can find no other source, but for the single New Zealand honey seller, that indicates that an HMF value at or above 10 mg/kg indicates that honey has been heated and therefore is not raw. And this very site also indicates that this value applies only to fresh honey, and only usually.

It is true that Wertymer cites other sources for the proposition that HMF can be used to detect heating, but only one of these sources—the New Zealand honey seller—indicates that 10mg/kg is the upper limit for unheated honey. And all of Wertymer's sources—including that of the New Zealand honey seller—indicate that a high HMF value can be an

indicator of several other factors including: (1) heating, (2) geographic location of harvesting, (3) chemical composition of the honey, or (4) degradation that comes from aging while in storage.

The chemistry journal to which Wertymer referred at oral argument as one of his key three documents upon which he relies for the upper HMF limit of honey does not set an upper limit for HMF in raw honey at all. And the language of this study which Wertymer incorporates directly into his complaint destroys Wertymer's claim by ascribing either heat *or* storage to higher HMF values. *See* R. 26 at 6, ¶28, n.11 ("'Nevertheless, although HMF occurs at very low concentrations and can even be absent in both fresh honey and food products, heat treatment *and/or prolonged storage conditions* can enhance further HMF production.'") (emphasis ours).[7]

In fact, the primary point of the Shapla study was to identify the many different factors that increase HMF values, including aging (Shapla at 1,2,3,7), differences in honey floral sources which change its "physicochemical properties (pH, free acid content, total acidity, lactone content and mineral content), water activity ($a_w$), the use of metallic containers, and thermal and photochemical stress. *Id.* at 4. Thus, according to this study upon which the complaint asks the court to rely as one of three critical sources, Walmart's HMF score of 22 mg/kg could indicate that the honey has been heated as Wertymer claims, but it could just as readily mean that the honey had been stored for over ten months, it came from a geographical area where it was harvested in a warm climate (it did; the honey came from Brazil), the pH value of the honey

---

[7] Citing Shapla supra note 4.

is low, it has a high fructose to glucose ratio, a high moisture content, or was stored in a metallic container. Given these alternative explanations for the HMF score of the Walmart honey, a claim that the honey was heated is far too speculative to avoid a motion to dismiss.

Wertymer's other key document is the one he relies upon for the claim in his complaint that "HMF is the most important and reliable criterion to detect heating of honey as it has the advantage for not be [sic] present in fresh honey.'" R. 26 at 5, ¶27. [8] But this article also notes that aging, origin, pH and acidity increase HMF values. Karabournioti at 2. In fact, the study noted that the elevated HMF value from one sample of known raw honey in the study, which tested at 26.8 mg/kg, could be attributed to the fact that the raw honey had been stored for about a year before testing. *Id.* at 1. Thus, this very study supports the finding that it would not be at all unusual for Walmart's raw honey, which had been stored for ten months, to have an HMF value of 22 mg/kg, without ever having been heated.

Finally, Wertymer relies on the Codex Alimentarius ("Codex")—which he says is "recognized by the World Trade Organization as an international reference standard for the resolution of disputes concerning food safety and consumer protection." R. 26 at 6, ¶31. We are not certain how the Codex

---

[8] Citing Sophia Karabournioti, "The Effect of Heating on Honey HMF and Invertase," Apiacta 4, April 4, 2001, at 2, *available at* https://mombeebee.ir/wp-content/uploads/2022/08/HMF.pdf. The article can be downloaded as a PDF. We use the page numbers as they appear in the PDF version of the article.

supports Wertymer's argument at all, as it simply sets a maximum HMF level for all honey—raw or not—of 40 mg/kg for some honey, and 80 mg/kg for honey from tropical areas, and Walmart's raw honey falls safely within both parameters. In fact, the Codex further belies Wertymer's claims, as it too recognizes that the geographic location of the hives affects HMF levels—setting a maximum HMF level for tropical honey that is twice that of other honey. Walmart's honey came from Brazil, a predominantly tropical country, and thus would be expected to have a higher HMF level.[9]

Despite the fact that the Codex does not distinguish between raw and not raw honey, Wertymer's lawyers have relied on its 40 mg/kg limit in at least four other cases to argue that honey above the Codex limit of 40 mg/kg in those cases was not raw. *See* Complaint at 6, *Greer v. Strange Honey Farm, LLC.*, No. 3:20-cv-00262-KAC-DCP (E. D. Tenn. June 12, 2020), ECF 1 (arguing that an HMF value over 40 mg/kg is "strong evidence" that raw honey was heated and thus not raw); First Amended Class Action Complaint at 4, *Pope v. The Kroger Company*, No. 1:19-cv-00817-DRC (S. Dist. Ohio July 16, 2020), ECF 22 (same); Amended Class Action Complaint at 4, 9-10, *Wingate v. Barkman Honey, LLC*, No. 5:19-cv-04074 (D. Kan. Aug. 27, 2019), ECF 53 (same); Second Amended Class Action Complaint at 6, *Pierce v. N. Dallas Honey Co.*, No. 3:19-cv-0410-B (N. Dist. Tex. May 5, 2025), ECF 24. (same). We are free to take judicial notice of the contents of the filings in these other cases. *See Daniel v. Cook County*, 833 F.3d 728, 742 (7th Cir. 2016). In this case, however, the laboratory testing

---

[9] *See* https://www.britannica.com/place/Brazil. A court may take judicial notice of geographical facts. *See, e.g., Cent. Green Co. v. United States*, 531 U.S. 425, 434 (2001).

revealed that the HMF levels in the Walmart honey were well below the 40mg/kg level, and thus counsel now relies on an alleged 10 mg/kg maximum for honey freshly extracted from the hive. Although Wertymer is not bound by claims made in other cases with different parties, the moving target certainly gives us pause about the integrity of counsel's claims in this case.[10]

In sum, Wertymer claims that Walmart's honey was heated based on its "elevated" HMF level. But Wertymer's complaint, including every key source referred to in the complaint and upon which he relied, acknowledges that honey may have HMF values above 10 mg/kg because the honey (1)

---

[10] We are not the first court to have qualms about the integrity of counsel's claims of fraud in a consumer product labeling case. One district court described counsel in the following way:

> Plaintiff's counsel has developed a fair bit of notoriety for filing cases about consumer labeling. Many of the complaints have suffered the judicial equivalent of a crash landing, or perhaps an explosion on the launch pad. They haven't survived for long.

> Lawyers have an obligation to file cases in good faith. *See* Fed. R. Civ. P. 11. Filing cases imposes significant costs on opposing parties, and on the judiciary itself. Courts have an institutional interest in protecting themselves from frivolous cases, because it is not fair to the countless other litigants in countless other cases that deserve a court's attention. When a party files a frivolous case, and consumes the Court's attention, everyone else foots the bill.

*Guzman v. Walmart Inc.*, No. 22-CV-3465, 2023 WL 4535903, at *3–4 (N.D. Ill. May 15, 2023) (citing other cases with similar admonitions to the same counsel).

was heated, (2) had been stored for some time and is not fresh out of the hive; (3) comes from a warm climate; or (4) myriad other reasons including pH, sugar content, metallic storage containers, or moisture content. A complaint is too speculative where there is an "obvious alternative explanation" for the complaint's factual allegations. *Iqbal*, 556 U.S. at 682. Here there is an obvious alternative explanation for the high HMF levels, if, in fact, they are high at all. The honey had not been freshly extracted from the hive when it was tested, had been stored for at least ten months, and came from a tropical climate. Wertymer has not asserted anything more than the most speculative guess that the higher HMF values came from heating, and that Walmart engaged in a deceptive act. Based on the sources cited in Wertymer's complaint, it is as likely as not, and perhaps more so, that Wertymer received exactly what he paid for—raw honey.

Wertymer's claim that the honey labeled "Raw Organic Honey" was processed is even more speculative. That claim is based on one factor—the presence of 0.06g/100g of mannose, a type of sugar. Wertymer's complaint alleges that the presence of mannose in any amount over 0.02g/100g is an indication that the honey has been processed.

As with the HMF values, Wertymer points to a single source in contending that raw honey must have a mannose level less than 0.02g/100g—the True Honey Buzz report attached to his complaint. The report from True Honey Buzz states that mannose levels above 0.02g/100g "*could* indicate the presence of foreign sugars or industrial processing practices which are not suitable for honey, An expert interpretation is suggested in such cases." R. 26, exh. 2 at 5 (emphasis

ours).[11] Wertymer did not engage an expert to interpret the data as instructed, but more importantly, a complaint that honey "could" contain a sugar indicative of industrial processing is not the same as alleging that it does.

Wertymer's complaint states that "[u]nder the Codex a concentration of mannose exceeding 0.02 g/100g in honey indicates the presence of foreign sugars or industrial processing." R. 26 at 7, ¶39. In our review of the Codex, we could not find any reference to mannose whatsoever.[12] By relying on these documents in the complaint, Wertymer has told the court "this is how I intend to prove the claim." But those documents reveal that the claim lacks even the most basic level of plausibility that *Iqbal* and *Twombly* require.

And even if the Codex did set a level for mannose or the True Buzz Honey report was correct that the levels in this honey *could* indicate industrial processing, once again, this amount of conjecture is simply insufficient for an allegation of harm in a complaint, particularly where the very sources upon which the complaint relies offer alternative possibilities. The report explains that mannose can be naturally present based on botanical or geographical origin. Lawsuits are not fishing expeditions in which the plaintiff can cast a claim that

---

[11] Wertymer argues in his brief that because the report states that the mannose level could indicate either the presence of foreign sugar or industrial processing, and the testing did not detect the presence of foreign sugar, by process of elimination, it must mean that the honey had been subjected to industrial processing. *See* Wertymer Brief at 13–14.

[12] We accessed the Codex at https://www.fao.org/4/w0076e/w0076e30.htm. We may consider documents that are central to the complaint, even if not physically attached to it. *Cmty. Bank*, 887 F.3d at 809 n.2.

he may have been harmed by something—if only he had the force of judicially ordered discovery to figure it out. Our pleading standards are not rigorous, but as we have now noted several times, they do require more than conjecture. *Iqbal*, 556 U.S. at 678-79 ("Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Because Wertymer has failed to state a plausible claim that Walmart mislabeled its raw honey, his claim for unfair practices under the Consumer Fraud Act also fails, as does his claim for common law fraudulent misrepresentation. We need not delve into the more specific requirements for a claim of fraud under Federal Rule of Procedure 9(b), as Wertymer has failed to allege a claim that Walmart made a false statement even applying the more generic requirements of Federal Rule of Civil Procedure 8 and *Iqbal* and *Twombly*.

In sum, Wertymer's complaint alleges that it is possible that Walmart sold honey labeled as "raw" that was not, in fact, raw. But the complaint also readily supports a conclusion that Walmart's honey was indeed raw and that he received exactly what he paid for. Any claim that Walmart violated the law or that Wertymer was damaged is mere conjecture and speculation. Federal courts require more of allegations in a complaint. The decision of the district court dismissing the complaint is therefore AFFIRMED.