In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 12-2698

BANK OF AMERICA, N.A.,

*Plaintiff-Appellant,*

*v.*

JAMES A. KNIGHT, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 303 — **Robert W. Gettleman**, *Judge.*

_____

ARGUED JANUARY 25, 2013 — DECIDED AUGUST 8, 2013

_____

Before EASTERBROOK, *Chief Judge*, and BAUER and KANNE,
*Circuit Judges.*

EASTERBROOK, *Chief Judge*. Bank of America lost about $34
million when Knight Industries, Knight Quartz Flooring,
and Knight-Celotex (collectively Knight) went bankrupt. It
contends in this suit under the diversity jurisdiction that
Knight's directors and managers looted the firm and that its
accountants failed to detect the defalcations. The parties

agree that Illinois law supplies the rule of decision. The district court dismissed all of the Bank's claims on the pleadings. 875 F. Supp. 2d 837 (N.D. Ill. 2012).

Frost, Ruttenberg & Rothblatt, P.C., and FGMK, LLC, were Knight's accountants. They invoked the protection of 225 ILCS 450/30.1, which provides that an accountant is liable only to its clients unless the accountant itself committed fraud (which no one alleges here) or "was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action" (§450/30.1(2)). The district court concluded that the Bank's complaint did not allege plausibly—see *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)—that the accountants knew that Knight's "primary intent" was to benefit the Bank.

The complaint alleges that the accountants knew that Knight would furnish copies of the financial statements to lenders, including the Bank, but the district court observed that auditors always know that clients send statements to lenders (existing or prospective). The statute would be ineffectual if knowledge that clients show financial statements to third parties were enough to demonstrate that the client's "primary intent" was to benefit a particular lender. The district court cited *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007) (Illinois law), and *Kopka v. Kamensky & Rubenstein*, 354 Ill. App. 3d 930 (2004), for the proposition that an auditor's ability to foresee who would receive copies of a financial statement differs from knowledge that a "primary intent" of the engagement is to benefit potential recipients. Other cases support the

same point. See, e.g., *Builders Bank v. Barry Finkel & Associates*, 339 Ill. App. 3d 1 (2003).

The Bank recognizes that *Tricontinental* forecloses its claim and asks us to overrule that decision. It is hard to see what the Bank could gain from such a step. We can overrule our own decisions but cannot change decisions of the state judiciary. *Kamensky* and *Builders Bank* are as solidly against the Bank's position as anything in *Tricontinental*. For the Bank to get anywhere, we would need not only to overrule *Tricontinental* but also to predict that the Supreme Court of Illinois would repudiate decisions such as *Kamensky* and *Builders Bank* from the state's intermediate appellate court. Yet we cannot see any reason to think that it would do so. Bank of America does not point to anything the Supreme Court of Illinois has written suggesting dissatisfaction with *Tricontinental*, *Kamensky*, *Builders Bank*, and similar cases.

At oral argument, we asked the Bank's lawyer what case it principally relies on. The answer: *Brumley v. Touche, Ross & Co.*, 139 Ill. App. 3d 831 (1985). *Brumley* indeed holds that an accountant can be liable to a client's lenders, if the accountant knows that the lenders might rely on the accountant's work. *Brumley* does not discuss §450/30.1, however, for the very good reason that it hadn't been enacted yet.

For many years Illinois followed the rule of *Ultramares Corp. v. Touche*, 255 N.Y. 170 (1931) (Cardozo, C.J.), under which accountants could not be liable to anyone other than their clients. *Brumley* expands the set of persons who can recover from an accountant; §450/30.1, enacted the next year, contracts it again—although the "primary intent" clause in §450/30.1(2) allows suit by some third parties, while *Ultramares* cut off all third-party claims. Decisions such as *Builders*

*Bank* hold that accountants may be liable to third parties when they know that the main reason a client engaged their services was to have financial statements to present to potential lenders. But Bank of America made its loans to Knight before the accountant defendants prepared their reports. No Illinois case holds that an auditor's knowledge of an *existing* loan demonstrates that the client's "primary intent" in engaging the auditor's services was to keep in the lender's good graces.

The client's "primary intent" is irrelevant when the client itself sues the accountant for malpractice. That led us to ask why the Bank is the plaintiff. Why not the trustee in bankruptcy? A trustee inherits all of a bankrupt entity's claims; a suit by the trustee would be treated just like a suit by Knight itself. But Knight was liquidated without the trustee advancing any claim against the accountants. We asked the Bank's lawyer at oral argument why it sued the accountants outside the bankruptcy rather than arranging for the trustee to bring the claim as part of the bankruptcy. The answer boiled down to the proposition that the Bank wants everything for itself; it is unwilling to allow other creditors to lay hands on any money. The upshot of this attitude is that the claim fails outright. A share of some recovery would be better than 100% of nothing. But that's the choice the Bank made.

"Why not use the bankruptcy process?" is a question that runs through this litigation. The claims against defendants other than the accountants, though phrased as contentions concerning breach of fiduciary duties, unjust enrichment, and so on, reduce to an allegation that the defendants extracted funds from Knight while it was insolvent (or that their extractions made it insolvent). The usual phrase for that

conduct is fraudulent conveyance, and once again the trustee could have pursued such a claim without encountering the obstacles that led the district court to dismiss the Bank's suit.

Our inquiry about why the Bank is pursuing an "unjust enrichment" claim, rather than the trustee a fraudulent-conveyance claim under 11 U.S.C. §548, was met with the declaration that nothing forecloses the Bank's choice. True enough, there's no legal rule *forbidding* a creditor to seek a recovery outside of a bankruptcy, but lots of legal rules make it difficult. One of them, which the district court stressed, is that a creditor can't recover on behalf of a corporate borrower without using the form of a derivative suit, see Fed. R. Civ. P. 23.1, which the Bank has not attempted to do. See *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987); *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir. 1989) (federal and Illinois law); *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158 (7th Cir. 1996) (Illinois law). A derivative suit, like a suit by the trustee, would make recoveries available to all of the firm's investors; that's what the Bank is trying to avoid.

The Bank can proceed in its own name to the extent that it has an assignment of the claims the estate in bankruptcy had against the directors and managers. And some (though not all) of the Bank's claims in this suit are included in an assignment from the trustee. We need not determine just which claims are included, because the district court dismissed them as inadequately pleaded. The judge thought that all of the Bank's theories against everyone other than the accountants depend on demonstrating that the defendants committed fraud, and the judge held that the complaint flunks the requirement of Fed. R. Civ. P. 9(b) that fraud be

pleaded with particularity—which is to say, "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The judge observed that the complaint "lumps all of the defendants together, never describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct." 875 F. Supp. 2d at 851.

According to the Bank, its claims do not depend on proof of fraud, so Rule 9(b) is irrelevant. We need not decide, because the problem the district court identified spoils the complaint as a matter of normal pleading standards. *Iqbal* and *Twombly* hold that a complaint must be dismissed unless it contains a plausible claim. A contention that "the defendants looted the corporation"—without any details about who did what—is inadequate. Liability is personal. An allegation that *someone* looted a corporation does not propound a plausible contention that *a particular person* did anything wrong. The Rules of Civil Procedure set up a system of notice pleading. Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy. Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope. The Bank's complaint does not get even that far.

The complaint that the district court dismissed was the Bank's third try—and, at 87 pages, it was short on specifics though not on words. The Bank insists that the district judge abused his discretion by dismissing the complaint with prej-

udice rather than allowing it to try again. But in court, as in baseball, three strikes and you're out.

The Bank was not making progress toward an acceptable complaint; the district judge saw it become longer without becoming more specific. And the Bank has not argued that it needed discovery to supply particulars. As Knight's principal lender, and through the bankruptcy, the Bank had ample access to Knight's books and records.

Perhaps the Bank could have shown, in its appellate briefs, that it is at last aware of the problem and able to fix the defects. Yet the briefs are as maddeningly vague as the complaint. They go on and on about what defendants collectively did, without imputing concrete acts to specific litigants. Here's a sample: "The Officers and the KE Board caused and permitted the Knight Entities to make substantial, interest-free, unsecured 'loans' and divert other assets to KQF for no value and with the express recognition that such liabilities would not be repaid. Additionally, they caused and permitted the Knight Entities to incur substantial operational expenses on behalf of KQF, including sales and marketing support, management direction, and payment of employee benefits and related support services. KQF never paid for those services. Defendants caused the Knight Entities to make these payments despite their admitted awareness of the Knight Entities' own liquidity crisis and related financial troubles and without properly accounting for the related-party transfers."

Rule 15(a) says that a party may amend its complaint once as a matter of course. After that, leave to amend depends on persuading the judge that an amendment would solve outstanding problems without causing undue preju-

dice to the adversaries. The Bank was allowed to amend twice, and its lack of success in giving notice and framing a manageable suit allowed the district judge to conclude, without abusing his discretion, that this suit has reached the end of the road.

AFFIRMED