In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3383

UNITED STATES, *et al., ex rel.* YURY GRENADYOR,

*Plaintiffs/Relator-Appellants,*

*v.*

UKRAINIAN VILLAGE PHARMACY, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 9 C 7891 — **Harry D. Leinenweber**, *Judge.*

ARGUED OCTOBER 3, 2014 — DECIDED DECEMBER 3, 2014

Before POSNER, ROVNER, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* This appeal is from the dismissal with prejudice of a complaint filed under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by Yury Grenadyor. He seeks a bounty for exposing fraudulent claims submitted by the defendants both to the federal government, *id.*, § 3730, and to several state governments on whose behalf he has filed pendent state law claims. The complaint also alleges retaliation against him by his employer in violation of the Act. The

judge dismissed the pendent and retaliation claims along with the fraud claim.

Our bounty hunter (in False Claims Act cases called the "relator") is a pharmacist formerly employed by defendant Ukrainian Village Pharmacy. The pharmacy primarily serves Chicago's Ukrainian community. There are believed to be about 46,000 persons of Ukrainian descent living in Chicago. See "Ukrainian American," *Wikipedia*, http://en.wikipedia.or g/wiki/Ukrainian_American (visited Dec. 1, 2014, as were the other websites cited in this opinion). Together with pharmacies that serve similar communities in other states and are joined as additional defendants in this suit, Ukrainian Village Pharmacy is alleged to be controlled by a handful of individuals of Ukrainian origin, mainly members of a family named Bogacheck. To simplify the opinion we'll generally pretend that Ukrainian Village Pharmacy is the only defendant.

Grenadyor claims that the pharmacy defrauded the government by making gifts to customers (such as tins of caviar), or forgiving their copays (even if they were not entitled under the law to such forgiveness), in order to induce them to have their prescriptions filled by it rather than by competing pharmacies. (The "copay" is the part of a medical bill that is not reimbursed by the government or an insurer.) The complaint also alleges that the pharmacy sought government reimbursement for drugs that were not delivered to the buyers.

The fraudulent character of claiming reimbursement for drugs that customers never received is obvious. The fraudulent character of giving discounts or refunds to the pharmacy's customers is less obvious—what is wrong with offer-

ing an inducement that reduces a product's cost to the consumer? The answer is that a discount or refund can become a "kickback" (a derogatory term meaning approximately "bribe") in a case such as this because it artificially inflates the price that the government pays pharmacies for prescription drugs for Medicare or Medicaid beneficiaries. (The government reimburses the pharmacy for the entire price charged the consumer, but places a ceiling on what the pharmacy can charge.) So for example the maximum that a pharmacy would be permitted to bill the government for a drug that the pharmacy sells for $10 would be, assuming a $1 copay, $9. But if the pharmacy waived the copay without telling the government, thus charging $9 rather than $10 to its customer but billing the government for the full $9 to which it would have been entitled had it not refunded the copay, it would be transferring $1 from the government to the patient. For it should have charged the government only $8, since all the customer paid was $9, of which $1 was supposed to be the copay, for which the government is not liable.

The $1 refund to the customer would thus have been a "kickback" in an appropriately pejorative sense because it would have increased the pharmacy's sales (and presumably its profits, as otherwise it wouldn't provide refunds) at the government's expense. It would have had done so either by diverting customers from other pharmacies or by inducing customers to purchase drugs that they would not have been willing to purchase had they been responsible for the copay. See Office of the Inspector General, "Special Fraud Alert," 59 FR 65372 (Dec. 19, 1994), https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html; Bruce Stuart & Christopher Zacker, "Who Bears the Burden of Medicaid Drug Copay-

ment Policies?," 18 *Health Affairs* no. 2, pp. 201–12 (1999), http://content.healthaffairs.org/content/18/2/201. There are additional concerns with such kickbacks, but we needn't get into them.

A person violates the False Claims Act if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the government. 31 U.S.C. § 3729(a)(1)(A). He must know the claim is false. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Grenadyor alleges a knowingly false promise that the pharmacy made on a form that it had to submit to the government in order to be permitted to enroll in the Medicare program and thus receive reimbursement for the drugs it sells to Medicare participants. The form, which the pharmacy signed before making any kickbacks, states: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute …)." Department of Health & Human Services, Centers for Medicare & Medicaid Services, *Medicare Enrollment Application: Clinics/Groups Practices and Certain Other Suppliers*, CMS-855B, § 15A, ¶ 3.

The district court ruled that this was not a false claim but merely a promise that the pharmacy failed to keep. The ruling was incorrect. If you say "I agree" when you don't agree, you're making a false statement, which in this case, Grenadyor alleges, induced the government to honor improper claims for reimbursement made by the pharmacy ($9 instead

of $8, in our example). Making a false promise in order to obtain something of value is fraud, *The Wharf (Holdings) Ltd. v. United International Holdings, Inc.*, 532 U.S. 588, 596 (2001), and can be the basis of a claim under the False Claims Act. *United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 917 (7th Cir. 2005).

The problem with this part of Grenadyor's complaint lies elsewhere: in an insufficient showing that the "I agree" statement was false when the pharmacy made it. It may have been an honest statement of intentions at the time, followed by a change of heart, motivated perhaps by greed, that caused the pharmacy to renege—and in that case the pharmacy would not have made any false statements, but simply have billed Medicare when it shouldn't have. The complaint alleges that the pharmacy knew when it made the statement that other pharmacies in the Bogacheck network had been giving kickbacks, and knew that as a member of the network it would do so as well. In other words Grenadyor is alleging a two-step false claim: first the falsity (which would have to be deliberate in order for the False Claims Act to apply), which lay in the pharmacy's promise not to give kickbacks, and then the claim for reimbursement by the Medicare or Medicaid program for drugs provided to customers who received kickbacks.

Because a public accusation of fraud can do great damage to a firm before the firm is (if the accusation proves baseless) exonerated in litigation, Rule 9(b) of the Federal Rules of Civil Procedure requires that "in alleging fraud … a party must state with particularity the circumstances constituting fraud." Missing from the complaint in this case are non-conclusory allegations that the pharmacy had decided to pay

kickbacks at the time it promised otherwise by signing the "I agree" statement. It may have believed that sooner or later the Bogacheks would exert pressure to which it might have to yield, but that would be different from what is alleged in the complaint—that it "*never* had any intention of keeping that agreement" (emphasis added). Anyway how could Grenadyor know? He didn't start working at the pharmacy until 2006—two years after the signing of the form.

The requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible. *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 668–69 (7th Cir. 2008); *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994). The complaint must state "'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992), quoting *Sears v. Likens*, 912 F.2d 889. 893 (7th Cir. 1990). Grenadyor failed to satisfy this pleading requirement.

He has, however, an alternative false-claim theory, called "implied certification," see Michael Holt & Gregory Klass, "Implied Certification Under the False Claims Act," 41 *Public Contract L.J.* 1, 1–4 (2011), and recognized in such cases as *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 306 (3d Cir. 2011), though treated as unsettled by our court in *United States ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, 764 F.3d 699, 711 and n. 13 (7th Cir. 2014). This theory does not depend on a defendant's having intended to make illegal kickbacks at the time it signed the

form for enrolling in the Medicare program. It requires only that the government, had it known the defendant was billing Medicare or Medicaid for drugs on which it had given kickbacks, would not have reimbursed it for any part of the cost of those sales. The theory treats a bill submitted to the government as an implicit assurance that the bill is a lawful claim for payment, an assurance that's false if the firm submitting the bill knows that it's not entitled to payment.

Even if we accept the validity of the implied-certification theory of false claims, Grenadyor has not alleged conduct within the scope of the theory with sufficient specificity to satisfy Rule 9(b). Regarding his allegation that the defendant routinely waived copays for Medicare and Medicaid patients, the complaint fails to allege facts sufficient to show that the pharmacy waived copays for other than "dual eligibles"—persons who being enrolled in both Medicare and Medicaid are allowed to be given such waivers provided that the pharmacy does not advertise the practice. See 42 U.S.C. § 1320a-7b(b)(3)(G). No waiver mentioned in the complaint exceeded the maximum copays that pharmacies are permitted to charge their dual-eligible customers. (The current maximums are $3.10 for brand-name drugs and $1 for generics. See 42 C.F.R. § 423.782(a)(2)(iii)(A).) And Grenadyor alleged no facts that would support his allegation that the waivers were advertised.

The principal kickbacks were not copays but instead tins of caviar. That sounds like a big deal if when one hears "caviar" one thinks Beluga, a type of sturgeon whose roe (i.e., eggs) might command a retail price of $250 an ounce or more. But the word is commonly applied to the eggs of other fish as well—for example, salmon roe is commonly referred

to as "salmon caviar," and the roe of other fish, such as trout, steelhead trout, lumpfish, and whitefish are also commonly called "caviar." The complaint alleges that it was the defendant's "standard practice to give at least the following with each delivery of prescriptions: one tin of caviar, plus either a packet of whole grains or a tin of Riga sprats (a small fish packed in oil), plus a Russian language T.V. Guide. This would be delivered every month. Customers with many prescriptions received an even larger allotment of gifts, often as much as two tins of caviar, and a packet of whole grains, and a tin of Riga sprats, and a Russian-language TV guide" (footnotes omitted). The complaint alleges that *all* customers received at least the "standard" package and that "this practice was so regular that when customers did not receive their regular monthly allotment, they would telephone the [Ukrainian Village Pharmacy] location to complain that they were missing whichever part of this package that was not included." Grenadyor alleges that both he and "Confidential Witness 'A'" saw defendants distribute gifts; photographs of the gifts are attached to the complaint.

But it is not enough to allege, or even prove, that the pharmacy engaged in a practice that violated a federal regulation. Violating a regulation is not synonymous with filing a false claim. To comply with Rule 9(b) Grenadyor would have had to allege either that the pharmacy submitted a claim to Medicare (or Medicaid) on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback (presumably if the pharmacy provided a drug to a Medicare patient it billed Medicare for the cost of the drug minus the copay). See *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 504 (6th Cir. 2007); *United States ex rel. Clausen v.*

*Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311–12 (11th Cir. 2002); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999). The complaint contains no such allegations. Similarly, by failing to identify a single patient who received multiple gift bags over the course of the year the complaint fails to allege with the requisite particularity that any customer received more than $50 worth of these goodies, the permissible amount before the anti-kickback rules kick in, see 65 Fed. Reg. 24411 (Apr. 26, 2000), or that those customers who did receive more were not Medicare or Medicaid recipients and so cost the government nothing.

Regarding the third type of fraud alleged—charging for drugs never delivered—again Grenadyor trips over Rule 9(b). The complaint alleges that the pharmacy would

> fax prescription refill requests for Medicare and Medicaid beneficiaries to the offices of their doctors for authorization even when neither the doctor nor patient requested it and the prescription was not medically necessary. On the times when that happened and the doctor nevertheless authorized a refill, it was particularly likely that the beneficiary would not appear to pick up the medicine because the beneficiary did not even know that the prescription had been filled— Defendants would, for example, ask for refills on non-chronic medications, such as antibiotics, without the patients' knowledge. The Bogacheks directed managers of [the defendant pharmacies] to bill Medicare and Medicaid for these prescriptions, even though the beneficiaries named in the claims never received their medication.

Missing is any allegation that indicates how Grenadyor, a pharmacist working for just one of the defendant pharma-

cies, obtained such information about a large number of pharmacies scattered over a number of states (besides Illinois, they are, according to Grenadyor, Florida, Georgia, Massachusetts, Minnesota, Missouri, and Ohio). He does allege that "Confidential Witness 'B'," who was employed in Minnesota, observed the practice in that state, but it is only one of the six states other than Illinois in which Grenadyor alleges kickbacks.

The complaint alleges two occasions on which the defendant pharmacy billed Medicare or Medicaid for drugs that patients never picked up. Grenadyor alleges that even after it became apparent that they would never pick up the pills, the pharmacy failed to "reverse[]" the charges for the pills— that is, erase its claim for reimbursement of all or part of the charges. This adequately pleads that the pharmacy submitted claims to Medicare and Medicaid for reimbursement of drugs that customers failed to take home, but not that the pharmacy failed to reverse the charges and did so with the intention of defrauding the government. Thus, for example, the complaint alleges that "at the Bogacheks' orders and direction Kharlamova [the manager of the Ukrainian Village Pharmacy] directed that the charges for the antihistamine and amoxicillin not be reversed. Accordingly, neither Kharlamova nor the pharmacy technicians working at her direction (Irina Milovanova, Oleksandra Polovinko, and Nadia Gnopko) ever reversed the charges for the antihistamine or amoxicillin, even though Patient H never received them." This allegation is insufficient because there is nothing to indicate when Kharlamova directed that the charges not be reversed, whether Grenadyor was present, and if not how he learned that the charges were never reversed. These are all things that Grenadyor, if he isn't fabricating the incident,

would know without having to conduct discovery. And if he can't allege how he learned that the charges had not been reversed, what basis has he for alleging they were never reversed? "I know they were never reversed, but I don't know how I know they were never reversed," is nonsense.

Repeatedly his complaint invokes "information and belief" as the basis for its allegations. That familiar formula won't do in a fraud case—for it can mean as little as "on rumor"—unless "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011), quoting *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992). The lonely reference to Confidential Witness 'B' does not suffice, given the breadth of Grenadyor's allegations.

It remains to consider his claim that the Ukrainian Village Pharmacy fired him in retaliation for his telling his superiors in the pharmacy that he was troubled by the kickbacks and by other unlawful acts that he claims to have observed. To establish retaliation under the False Claims Act a relator must prove that he was retaliated against "because of lawful acts done by [him] in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). That is the current wording of the statute, but it appears that Grenadyor was fired when the statute, not yet amended, had forbidden retaliation "because of lawful acts done … in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed." Even under that language, however, as we indicated

in *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 481 (7th Cir. 2004), and earlier in *Neal v. Honeywell Inc.*, 33 F.3d 860, 865 (7th Cir. 1994), in accordance with *United States ex rel. Yesudian v. Howard Univ*ersity, 153 F.3d 731, 742 (D.C. Cir. 1998), retaliation for filing an internal complaint (that is, a complaint with one's employer, as distinct from a lawsuit) is forbidden; the language of the amended statute is merely clearer.

Apart from Grenadyor's claim of retaliation, his complaint that the defendants violated the False Claims Act is as we have explained fatally deficient. Ordinarily the dismissal of a deficient pleading is without prejudice, thus giving the pleader an opportunity to replead. Grenadyor was given that opportunity and filed an amended complaint, yet he failed to cure the deficiencies of his original one. For example, though alerted by the judge to his failure to name even one person who had received more than $50 worth of kickbacks in a year, see 895 F. Supp. 2d 872, 875–76, 878–79 (N.D. Ill. 2012), Grenadyor was unable to repair the failure. The district court did find that Grenadyor had identified the provision of free laxatives to a named customer on a specified date, but he had failed to allege who gave the laxatives to the woman or who directed that gifts be given out for free.

"Rule 15(a) says that a party may amend its complaint once as a matter of course. After that, leave to amend depends on persuading the judge that an amendment would solve outstanding problems without causing undue prejudice to the adversaries." *Bank of America, N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013). The district judge noted that since filing suit in 2009 Grenadyor had "had four opportunities to plead his claims. In the process, he has dropped par-

ties, dropped claims, and added allegations in an attempt to describe adequately a fraudulent scheme involving Defendants. It now appears to the Court that he cannot do so, though not for lack of trying." The district judge thus did not abuse his discretion in dismissing with prejudice the kickback claims in the complaint. But we must reverse and remand with regard to the retaliation claim, as we have explained.

It remains only to consider the pendent state law claims. Grenadyor mentions them only briefly, at the end of his opening brief, saying: "Both sides and the District Court agree that these state statutes are construed substantially as the federal FCA is, and so Counts under the State Statutes rise or fall with the federal claims. Dkt. No. 312 at 13-14. Moreover, in *Amgen* [*New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011)] the First Circuit analyzed the Illinois and Massachusetts healthcare laws and found that they justified valid pendent state false claims act claims when kickbacks were provided in those two states by healthcare providers. As shown above, Mr. Grenadyor's claims are sufficiently pleaded under the FCA. If this Court returns the case to the District Court, the state claims should also be revived." The only reference is to kickbacks. There is no mention of retaliation in relation to the state claims, either in the district court's opinion or in any of the briefs in this court. But we'll leave it to the district judge to decide in the first instance whether Grenadyor should be permitted to press a state-law retaliation claim on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.