In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3305

UNITED STATES OF AMERICA ex rel. ALBERT C. HANNA,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 4885 — **Andrea R. Wood**, *Judge.*

ARGUED MAY 19, 2016 — DECIDED AUGUST 22, 2016

Before WOOD, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. In order to receive federal housing funds, the City of Chicago must certify that it is in compliance with a number of federal requirements related to reducing the city's racial segregation. Albert C. Hanna's suit against the City alleges that it violated the False Claims Act because its policies—in particular, "aldermanic privilege" and strategic zoning of relatively wealthy neighborhoods—have actually

*increased* segregation, making its certifications false. But, as the district court properly recognized, Hanna has not alleged the circumstances of the purported fraud with sufficient particularity to satisfy Federal Rule of Procedure 9(b). We therefore affirm its judgment.

**I**

Chicago is, by its own admission, a "highly segregated city" and has been for more than 50 years. CITY OF CHICAGO, 2010–2014 CONSOLIDATED PLAN 19 (2010). Whites predominately live on the North, Northwest, Southwest and far South Sides, while African-Americans live mostly on the West and South Sides. *Id.* at 20. (We omit details about other racial or ethnic groups, of which there are many, because they are not central to this case.) This geographic distribution "has remained fundamentally constant" since the 1980 census. *Id.*

Hanna is a long-time resident of Chicago's Lincoln Park neighborhood. For more than half a century, his professional and personal activities have included real estate development, real estate financing, civic affairs, and philanthropy in Chicago. He has "a particular concern for providing affordable housing in quality neighborhoods," and so filed his original *qui tam* complaint in 2011. The United States declined to intervene in 2013. We evaluate the allegations in his amended complaint; we assume the truth of these allegations for present purposes. *Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007).

Hanna alleges that during the six years before he filed this suit, the City knowingly made false claims and certifications to the U.S. government. One such representation was that it had complied—and would comply—with certain civil rights

requirements. It did this in order to receive more than $1 billion in funds from federal programs administered by the U.S. Department of Housing and Urban Development (HUD). Those requirements arise under several laws. Hanna alleges that the City "was required … to certify that it [would] administer each grant in compliance with Title VI, 42 U.S.C. § 2000d, *et seq.* and implementing regulations at 24 C.F.R. Part 1," "the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and its implementing regulations at 24 C.F.R. Part 100," and "42 U.S.C. §§ 608(e)(5), 5304(b)(2), and 12705(b)(15) and applicable HUD regulations." Finally, he asserts that "[a]s defined by HUD and by caselaw, the … obligation [affirmatively to pursue fair housing] requires the City to conduct '[a] comprehensive review of [its] laws, regulations, and administrative policies, procedures and practices[, and a]n assessment of conditions, both public and private, affecting fair housing choice for all protected classes." He has not, however, given any further details about which specific statutory and regulatory provisions the City violated, what those provisions said, or how exactly the City's conduct violated them.

Hanna separates Chicago's neighborhoods into two categories: those with "lower poverty rates, good community services and commercial amenities, job opportunities, safe neighborhoods and good schools" he calls "areas of opportunity"; those lacking those attributes he labels "low-opportunity areas." The City knew, Hanna says, which neighborhoods were typified by segregated living patterns (more than 75% minority population) and which were typified by high poverty rates (more than 40% of population with incomes below the federal poverty line). The City also knew that there

was predictable overlap between these categories: the desirable areas had larger White populations and smaller African-American and Latino populations than Chicago in general.

Hanna asserts that despite its knowledge of these facts and its obligation to take affirmative steps to secure fair housing, the City knowingly administered its affordable housing and funding programs, along with its zoning and land use laws, with the purpose and effect of locating affordable, multifamily rental housing units in the less desirable areas and discouraging their location in the better neighborhoods. Doing so perpetuated and intensified the already-existing racial and ethnic segregation of Chicago's neighborhoods.

The City allegedly enacted these goals through two policies: "aldermanic privilege" and disproportionately downzoning advantaged neighborhoods—that is, rezoning areas suitable for multifamily development so as to prevent or limit new construction of such projects. Chicago is divided into 50 wards, each of which elects an alderman to sit on the city council. Under "aldermanic privilege," the City grants each alderman the "full authority to determine whether and where affordable, multifamily rental housing will be built and renovated in the ward." According to Hanna, aldermen in the desirable, largely White areas used their authority to prevent such housing from being built in their wards.

Through these devices, the City directed hundreds of millions of dollars in federal funds for affordable housing primarily into racially or ethnically segregated, low-income areas. In the 1960s, 1970s, and 1980s, when a majority of the projects built with these funds were not controlled by the City, roughly half of the affordable, multifamily rental housing was

located in areas that were already well-to-do. In the 1990s, after the Chicago City Council began administering the funds, that percentage declined to only ten percent. During the six years covered by Hanna's complaint, the City approved funding of more than 2,600 housing units in 35 developments for low- and moderate-income families and children. Seven percent of those units were located in wealthier areas; 93% were located in low-income areas.

The complaint also contends that the City grants aldermen control over zoning, land use, building codes, and decisions about affordable housing funding and location within their wards. Aldermen in primarily White, higher-income neighborhoods use this authority to "downzone" areas suitable for multifamily development so that this use would be prohibited or limited. The City's 2004 Zoning Ordinance also downzoned many advantaged areas, thus preventing the building of affordable, multifamily housing unless the alderman personally intervenes to rezone parcels for such use.

According to the Mayor's Zoning Reform Commission, the 2004 Zoning Ordinance's stated purpose was to "reinforce … established patterns" and to "preserve neighborhood character." But Hanna contends that this rationale was a smokescreen: the true purpose and effect was to limit development of affordable, multifamily housing units—and therefore opportunities for African-American and Latino families—in predominantly White neighborhoods. The City also downzoned or applied landmark status to more than 5,200 acres of private, residentially zoned land. (The City's Historic Preservation Ordinance severely limits redevelopment of locations designated as "landmarks.") Nearly two-thirds of that territory was within desirable areas. Meanwhile, the City did

not analyze or disclose in its five-year "Consolidated Plans" (submitted to HUD in 2004 and 2010) how its zoning and land use practices affect fair housing options for African-American and Latino families.

Hanna sued the City under the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)(A) and (B), alleging that the City had falsely certified compliance with its civil rights obligations while perpetuating policies and practices that increased residential segregation. Based on these certifications, it submitted claims that yielded millions of dollars in funds from federal programs, and thus defrauded the U.S. government. The City moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim. The district court initially dismissed the complaint without prejudice, finding that Hanna had not pleaded the alleged fraud with sufficient specificity, and granted Hanna leave to amend. Hanna filed an amended complaint, which the City once again moved to dismiss. The district court granted the City's motion, this time with prejudice, and Hanna appealed.

## II

We review the district court's decision to grant the City's motion to dismiss *de novo*. *Tricontinental*, 475 F.3d at 833. In relevant part, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(1)(A), (B). To prove an FCA claim, Hanna must show (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false. *U.S.*

*ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011).

Because it is an anti-fraud statute, claims under the FCA are "subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (internal citation omitted). This means that the plaintiff must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). To meet this standard, the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). That includes "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) (internal quotation marks omitted), *cert. denied*, 136 S. Ct. 49 (2015).

Before addressing the merits, we need to say a word about what exactly is before us for review. Hanna's briefs on appeal set out a number of the statutes and regulations with which the City allegedly falsely certified compliance—his pleadings, however, did not. Hanna argues that the statutes and regulations provided in his briefs to this court may be considered along with his pleadings because a "plaintiff need not put all of the essential facts in the complaint" but instead "may add them by affidavit or brief—even a brief on appeal." *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963–64 (7th Cir. 1992).

This is true for pleading under Rule 8, which applies to most pleadings and requires only a "short and plain statement of the claim showing that pleader is entitled to relief."

FED. R. CIV. P. 8. Rule 8 requires notice pleading, not fact pleading. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The party defending the adequacy of a complaint may point to facts in a brief or affidavit "in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment." *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992). Nothing in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), or *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), changed that rule; those cases simply emphasized that the pleadings must present a plausible claim for relief.

Rule 9(b), however, is an exception to the notice pleading regime. Fraud and mistake must be pleaded with particularity; the pleader is not free to hold back and add facts via affidavit or brief. Indeed, the purpose of Rule 9(b) is to "force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). We thus evaluate Hanna's allegations only as they appear in his complaint.

On to the merits. The City argues that Hanna's complaint does not satisfy Rule 9(b) because it gives no information about which regulatory provisions Hanna thinks the City violated; it does not even draw a link between the statutes Hanna is now citing and any particular alleged false certification. The City has a point. Where the allegedly false certification relates to a failure to comply with certain statutory and regulatory provisions, the plaintiff should be able to tell the City which ones it flouted, and how and when. If the particularity requirement is meant to ensure more thorough investigation before filing, it is not too much to ask that one aspect of that investigation include the specific provisions of law

whose violation made the certification of compliance false. Moreover, if, as in this case, a defendant is presented only with an undifferentiated raft of statutory and regulatory provisions, it will be nearly impossible for the defendant to prepare a defense. And the district court will find it quite difficult, on a motion to dismiss, to determine whether the defendant actually falsely certified compliance with any specific provision.

Note that we are not saying that plaintiffs in Hanna's position must list the City's promises with any more particularity than that with which the City made them. Unlike the Ninth, Sixth, and Second Circuits, we have never demanded that a plaintiff explain in her complaint *why* the claim was false. See *Cooper v. Pickett*, 137 F.3d 616, 625 (9th Cir. 1997); *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Although we mentioned in *U.S. ex rel. Garst v. Lockheed-Martin Corp.* that the *district court* instructed the plaintiff to state why the claims were fraudulent, our opinion does not hold that it was necessary to do so under Rule 9(b). See 328 F.3d 374, 376 (7th Cir. 2003). Similarly, *Gensler v. Strabala*, describes the Rule 9(b) standard somewhat informally as "what [the defendant] said and why it is false." 764 F.3d 735, 737 (7th Cir. 2014). But neither of these cases marked a break with past precedent. *Gross* is inapposite; it dealt with whether the plaintiff had sufficiently alleged that the defendant's allegedly false statement was meant to "coax a payment of money from the government." 415 F.3d at 604.

Hanna's particularity problems do not end with his failure to be specific about which statutes or regulations that the City violated. He also does not allege the "time, place, … and the method by which the misrepresentation was communicated

to the plaintiff." *Grenadyor*, 772 F.3d at 1106. Beyond the fact that the certifications were made yearly, "typically in December," Hanna says nothing more about timing. Nor does he allege the place, either the physical location or the specific documents.

Finally, he does not indicate how the allegedly false certification was communicated to him. Although Hanna may have been able to plead facts about the relevant documents on information and belief if he had shown they were "not accessible" to him and provided "the grounds for his suspicions," *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011), he did neither. In fact, the documents in question are probably publicly accessible. This may be the real problem with Hanna's case: the FCA is meant to encourage whistleblowing by insiders, and Hanna seems to have no insider knowledge. See *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 273 (7th Cir. 2016) (noting that Congress in enacting the FCA sought "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own" (quoting *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)). For a variety of reasons, therefore, Hanna's complaint was properly dismissed.

### III

We AFFIRM the judgment of the district court.